UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| ALFONSO PACHECO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 15-cv-1131 (RCL) |
| | ) | |
| ST. MARY'S UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

Plaintiff Alfonso Pacheco was a student at defendant St. Mary's University, a private Catholic university located in San Antonio, Texas. He was suspended from the university following accusations and a subsequent finding that he committed violations of the university's Code of Conduct for sexual harassment against a fellow student and conduct inconsistent with the university goals and values. Pacheco sued St. Mary's, as well as two members of the St. Mary's Police Department, Officer Apolonia Vargara and Officer Francisco Osuna, alleging that St. Mary's procedures in investigating and disciplining students "discriminates against men who are accused of sexual misconduct on the basis of their sex" and are "fundamentally unfair." Compl. 1, ECF No. 1. Pacheco's complaint raises claims for breach of contract, violation of Title IX of the Education Amendments Act of 1972,[1] negligence, violation of the Fifth and Fourteenth Amendments to the United States Constitution, and for declaratory relief under 22 U.S.C. § 2201.

---

[1] Public Law No. 92-318, 86 Stat. 235, codified at 20 U.S.C. §§ 1681–1688 (hereinafter "Title XI").

Defendant St. Mary's and defendants Osuna and Vargara separately moved for summary judgment. ECF Nos. 20 & 21. Before the Court are defendants' summary judgment motions, plaintiff's respective response, ECF No. 25, and defendants' joint reply, ECF No. 29. Also before the Court is defendant's joint motion to exclude plaintiff's summary judgment evidence as irrelevant pursuant to Rule 402 of the Federal Rules of Evidence. ECF No. 30. Plaintiff did not respond to the motion to exclude. For the reasons articulated below, the Court finds that the motion to exclude should be **DENIED**, and the motions for summary judgment should be **GRANTED**.

## II. BACKGROUND

On the night of May 2, 2014, Alfonso Pacheco, a senior male student, took complainant, a junior female student, to the Kappa Sigma formal, which was held at a bar in downtown San Antonio called the Cadillac Bar. Pacheco and the complainant consumed alcohol prior to and during the formal. The two returned to campus, along with four other students, in the early morning hours—approximately 1:30 a.m. The other students in the car were Brian Zavala, Crystal Zapata, Mia Silva, Christopher Trevino, and Jamie De Los Santos (the driver). According to the others, Pacheco and the complainant were "making out" and exchanging sexually explicit language regarding acts they wanted to perform on each other. When the car arrived at campus, Trevino, Pacheco, and the complainant exited for the Chaminade Residence Hall. Pacheco and the complainant went upstairs to Pacheco's room on the second floor.

Across the hallway from Pacheco's room, Azalea Griego and Fabian Hernandez were watching movies. Pacheco apparently was having trouble unlocking the door to his room due to being highly intoxicated—he was trying to open his dorm room with his mailbox key. The complainant, who was familiar with Griego, asked Hernandez if he would help Pacheco open the door. Hernandez helped Pacheco open the door and deliberately switched the locking mechanism to remain

unlocked. Pacheco entered the room and unbuckled his pants, telling Hernandez "It's ok bro, I have protection." Pacheco showed Hernandez that he had a condom. Griego asked the complainant if she needed to be taken to her dorm room, but complainant responded "No, I need you to take me to where Pattie's [a sorority sister] at." Trevino returned and told Hernandez and Griego that he would handle the situation. Griego and Hernandez went back to their room. Trevino took complainant and Pacheco into Pacheco's room.

Griego called Pattie—Patricia Escobedo—to tell her about the situation. Escobedo said that she knew Pacheco and that she trusted him. Griego and Hernandez then went to the laundry room, and Hernandez told Griego that Pacheco had showed him a condom saying "I have protection." Griego said she was going to call Pattie. They returned from the laundry room and listened to through the door of Pacheco's room. Griego called spoke to Pattie, telling her that Pacheco had unbuckled his pants and produced a condom. Pattie told her to "get [the complainant] out of there" and to bring the complainant to Pattie's room.

Griego and Hernandez knocked on Pacheco's door, but knew the door was unlocked from when Hernandez had helped Pacheco open his door. They the heard bed-spring squeak, a thump, and plaintiff yell "turn around." Griego and Hernandez opened the door and entered the room. Pacheco was standing with his pants and underwear around his ankles, attempting to remove the complainant's underwear. She was lying motionless, face-down with her legs off the side of the bed and her dress pulled over her thighs. Pacheco had an erection. Griego believed the complainant was unconscious and pushed Pacheco out of the way. Hernandez carried the complainant out of the room. She was mostly mumbling unintelligibly, but Hernandez heard her say something like "I'm so embarrassed."

3

Griego and Hernandez took complainant to Pattie's room in John Donohoo Hall. After Pattie returned, she spoke with Griego and attempted to call a sorority advisor. Pattie got no answer. She then called the University Police Department to report the incident. Officers Apolonia Vargara and Francisco Osuna took the call and responded to John Donohoo Hall. The officers were joined by Patricia Lathen, St. Mary's Director on Duty, who was present while the officers spoke with Pattie and Griego. The officers were not able to speak with complainant due to her level of intoxication. Griego and Pattie informed them that the complainant's belongings were still in Pacheco's room.

Officers Vargara and Osuna, accompanied by Director Lathen, went to Pacheco's room in Chaminade Hall. Pacheco answered the door, and the officers noted the smell of alcohol. Pacheco appeared intoxicated and there was vomit on the floor, sink, and cabinets of the room. They asked if anyone had been in the room that evening, which Pacheco denied. When asked about a female shoe visible on the floor, Pacheco said it belonged to him. Officer Vargara noticed the complainant's purse under Pacheco's bed. When asked who the purse belonged to, Pacheco admitted that it belonged to the complainant and that she had been in his room but left because she was tired. The officers gave Pacheco clothing to wear, placed him in handcuffs, and arrested him. They escorted him out of the dormitory, down a flight of stairs, and to the police station. Pacheco was apparently able to walk under his own power.

At the police station, Pacheco was Mirandized and agreed to speak with the police. He said he had invited the complainant out on a date, that they had been drinking at the Cadillac Bar, and that they returned to the university that night. However, Pacheco claimed that the complainant wanted to go back to her dorm because she was tired, and that Pacheco told her to go to her room because she was too intoxicated. After the interview with police, Pacheco was transported to the

magistrate's office for criminal charges of Attempted 3rd Degree Sexual Assault, Texas Penal Code §§ 15.01, 22.011. Those charges were referred to the Bexar County District Attorney. While at the Bexar County Jail, Pacheco was given notice of a temporary suspension excluding Pacheco from all university facilities, property, and events for the duration of the suspension.

The next morning, May 3, 2014, the complainant was interviewed by Captain Jeff Earle. The complainant remembered having a drink before the formal, and two margaritas at Cadillac Bar. According to her statement, the last thing complainant remembered at Cadillac Bar was line dancing and sitting down at a table. The next thing she remembered was being woken up in Pattie's dorm room. She apparently did not remember how she got there or what had happened in Pacheco's room. After speaking with Captain Earle, the complainant spoke with Tim Bessler, Dean of Students at St. Mary's University. Bessler told her that "everything would be okay" and that she had "done nothing wrong." He explained that the university would respond by selecting a panel to investigate the matter, and that any resulting charges would fall under Title IX. If the investigation found sufficient evidence to support formal charges for a violation of university policy, Pacheco would be charged and have the right to a disciplinary hearing to determine whether he was responsible for the charges.

The grievance procedure regarding violations of the St. Mary's Code of Conduct consists of three phases. First, is the investigation phase. According to the Student Handbook, formal investigations may be conducted to resolve factual disputes. A fact-finding panel may consist of no more than three persons from the university. In appointing the panel, a supervisor must state the terms and conditions of the investigation. The panel has no authority to make recommendations or impose final actions. Rather, the panel presents facts to the supervisor, and the supervisor determines the proper disposition based on a hearing.

The second phase is this hearing phase. The procedures observed in the hearing are as follows:

i.  The hearing will be conducted in private. Indications of irresponsible discussion of the grievance outside of the formal hearing may become the basis for allegations that due process has been violated. All parties to the hearing are cautioned against irresponsible discussion. The parties will make no public statements about the case during the course of the hearing.

ii. During the proceedings, all parties will be permitted to have an advisor present. All parties to the grievance will have the right to obtain witnesses and present evidence. The University will cooperate with all parties in securing witnesses and making available documentary and other evidence requested to the extent permitted by law.

iii. All parties have the right to question witnesses, however, the accused and the accuser may not question each other. When a witness has made a written statement and cannot or will not appear, but the chair determines that the interests of justice require admission of that statement, the Chair will identify the witness, disclose the statement, and if possible, provide for interrogatories. The Chair will also grant appropriate continuances to enable either party to investigate evidence, or for any other appropriate reason.

iv. In all cases, the burden of proof shall be on the grievant. However, the Chair will not be bound by strict rules of legal evidence. The decision will take the form of findings of fact, conclusions, and recommended disposition of the grievance. The findings of fact, conclusions, and recommended disposition must be based solely on the hearing's record, pertinent University procedures set forth in this statement, and the laws of the State of Texas and the United States of America.

ECF No. 20–9. The result of the hearing must be reported to students in writing within ten days of the date the grievance was received. If the hearing extends beyond ten days, the supervisor must inform the student of the delay and the expected response date. Students must also be informed that they have the right to seek appeal.

The third phase is the appeals phase. Students may seek review of the disposition by the appropriate Vice President. The Vice President's decision "should be transmitted to the student within ten (10) working days from the date the written appeal was received." ECF No. 20–9. The Vice President's decision constitutes final agency action.

On the evening of May 3, 2014, Pacheco was released on bail from Bexar County Jail. The next day he noticed some bruising on his arms, apparently from where the officers gripped his arms escorting him to the police station. Pacheco was informed by John Wickline, the Director of

Judicial Affairs at St. Mary's, that Pacheco was temporarily suspended, pending an investigation and that he was not allowed to enter campus without permission. Pacheco arranged a meeting with Bessler on or about May 5th. Bessler explained the suspension and investigation process, and outlined Pacheco's due process rights articulated in the Student Handbook. Pacheco informed Bessler that he would not speak about the incident without an attorney present. Following the meeting, Pacheco retained an attorney.

On June 3, 2014, Pacheco was informed of the results of the university's investigation. The investigatory panel was made up of three panelists: Carmen Nasr, an Assistant Director of Residence Life, Benjamin Underwood, an Assistant Director of the University Center and Conference Services, and Jasmine Ellis, Athletics Compliance Officer. The panel interviewed the complainant, as well as Griego, Hernandez, Trevino, Pattie Escobedo, and Adrianna Cortez, a friend of Escobedo's who was present at the time of the incident. Pacheco refused to participate and was not interviewed. The panel summarized the interviews in a report dated May 29, 2014, and concluded that there was evidence that Pacheco violated the Code of Conduct. Specifically, Article II Point B for sexual harassment, Article II Point B for attempted sexual assault, and Article II Point A for conduct inconsistent with the Christian goals and values of the university.[2] The June 3, 2014 notice requested Pacheco to schedule a meeting to discuss the next steps in the process.

Around July 9, 2014, Pacheco and his attorney reviewed the witness statements and other documents used by the investigation board.

---

[2] Under the Code of Conduct, sexual harassment is defined as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (A) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic status; (B) submission or rejection of such conduct by an individual is used as a basis for employment or academic decisions affecting such individual; or (C) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or offensive working environment." ECF No. 20–9.

The other two offenses—sexual assault and conduct inconsistent with the university's goals and values—are undefined by the Code. However, the Code does emphasize the importance of "growth, community and Christian values" including "the promotion of truth, honesty, personal integrity and self-responsibility." ECF No. 20-9.

On July 29, 2014, the university convened a hearing to determine whether Pacheco would be found responsible for violations of the University Code of Student Conduct. The hearing panel was made up of three panelists: Karen Williams, James Villareal, and Kathe Lehman-Meyer. Neither the complainant, nor Pacheco or his attorney, attended the hearing. No witnesses were called by the absent parties. Rather, the panel reviewed statements given to the investigators, including the statement by the complainant. Pacheco had not given an interview to the investigators and did not present evidence, so the panel did not consider his version of events.

On August 5, 2014, the judicial board found Pacheco not responsible for sexual assault but responsible for sexual harassment and conduct violating the university's goals and values. Accordingly, he was suspended and restricted from being on St. Mary's University property until August 1, 2017. Pacheco was informed he had the right to submit an appeal, in writing, to the Dean of Students—Bessler—within five days. The notice included a link to the Code of Conduct in the Student Handbook for details on the appeals process outlined above.

On August 11, 2014, Pacheco filed an appeal on the basis that he did not have a reasonable opportunity to prepare and present rebuttal of allegations against him, that the hearing was not conducted fairly in light of Dean Bessler's previous interactions with the complainant, and that the investigative team did not interview all students with knowledge of the incident. The appeals board convened on August 28, 2014 to review Pacheco's appeal. The board consisted of Leah Bowen, Brian Martinek, and Jaqueline Peña. The appeal board found that Pacheco had a reasonable opportunity to prepare and present rebuttal of said allegations, that the hearing was conducted fairly, and that the investigative team did not exclude evidence. Specifically, the board determined that Pacheco was sent a copy of his conduct record with redacted names of students who had not consented to having their records released outside the university. Further, the board

8

determined that Pacheco was aware of the guidelines and procedures of the investigative process, as articulated in the Student Handbook. The board also noted that Pacheco chose not to participate in the hearing, despite having the opportunity to present and question witnesses, and did not identify any additional persons with knowledge of the incident to the investigative board. Finally, the board determined that Bessler's comments to the complainant that she had done nothing wrong, did not show bias or favoritism or render the hearing unfair. The board wrote:

> The original hearing was conducted fairly in light of the charges and evidence presented. Mr. Pacheco particularly called into questions a statement made by the Dean of Students, Dr. Tim Bessler. Dr. Bessler told the complainant that she had done nothing wrong. After interviewing Dean Bessler the appeals board was able to understand the context of this statement. The statement was made to address a level of support for the complainant, it was not a comment directed toward the incident itself. The complainant was concerned about the consequences of her speaking about the incident to the Dean of Students, police, etc. This is what Dr. Bessler was referencing when he stated she "did nothing wrong." The Dean of Students also shared that it is his responsibility to show care and support for all students. The Appeals Board also noted that this statement is provided in the same document that Mr. Pacheco is referring to.

The disposition of the original judicial body was affirmed by the appeals panel on September 3, 2014. At some point, the criminal charges were dropped, and the only discipline imposed for the incident was through the St. Mary's proceedings. Pacheco's suspension from St. Mary's remains in effect until August 1, 2017. While he missed his graduation ceremony due to the suspension, he was conferred a degree and is a graduate of St. Mary's.

These facts are largely undisputed.[3] However, there are some key disputes over additional details. First, the parties dispute whether the complainant was passed out in the room with Pacheco before Hernandez and Griego entered, or whether she had consented to sexual intercourse with

---

[3] The Court largely recites defendant St Mary's statement of facts, as adopted by plaintiff. Resp. 4 ("The facts in this case are largely undisputed and with the some [sic] exceptions outlined herein, the Plaintiff adopts the Defendants statement of facts . . . .").

Pacheco. Second, the parties also dispute whether Pacheco was told that he was not allowed access to an attorney during the investigation and appeals process. Third, the parties dispute whether Pacheco was told that he would not be allowed to cross-examine witnesses or introduce evidence, such as a cell phone video of Pacheco and the complainant making out during the ride back to campus. Fourth, the parties dispute whether the police officers "roughed up" Pacheco after the arrest, denied him access to water or a bathroom at the police station, or otherwise used excessive force in violation of his constitutional rights during his arrest. This action arises from those disputed allegations.

### III.  PROCEDURAL HISTORY

On December 17, 2015, Pacheco filed the instant suit alleging five claims: (1) breach of contract, (2) violation of Title IX, (3) negligence, (4) violation of constitutional rights, and (5) a declaratory judgment that St. Mary's rules, regulations, and guidelines are unconstitutional or unlawful. Compl. 15. On March 1, 2017, defendants moved for summary judgment, arguing that plaintiff's claims fail as a matter of law. ECF Nos. 20 & 21. Specifically, St. Mary's argued that there is no Title IX theory of liability under which Pacheco can recover and that there was no breach of contract or negligence on the part of St. Mary's. Similarly, Officers Osuna and Vargara argued that there was no excessive force or denial of water or bathroom use in violation of Pacheco's constitutional rights.

On March 10, 2017, the parties agreed to an initial extension of time to file a response, ECF No. 23. On March 13, 2017, Judge Pitman granted the extension to April 15, 2017. On April 12, 2017, days before the response was due, Judge Pitman ordered this case reassigned to Judge Royce C. Lamberth. ECF No. 24.

On April 16, 2017, Pacheco filed his response to the motions for summary judgment. ECF No. 25. At the time of filing, the response was untimely by one day. However, the following day, April 17, 2017, plaintiff filed an unopposed Rule 56(d) motion to extend the response deadline one day due to "a problem with his computer on April 15, 2017." ECF No. 26. Plaintiff sought an extension of the response deadline to April 17, 2017 and asked this Court to "deem his motion timely." ECF No. 26. While the motion was captioned "unopposed," it lacked a certificate of service to the opposing parties. ECF No. 27. Plaintiff filed the certificate of service following day, April 18, 2017. ECF No. 28.

On April 27, 2017, defendants filed a joint reply to the untimely response. ECF No. 29. The reply noted that there were no genuine issues of material fact, but did not address the timeliness of the response. No opposition to the motion for extension was ever filed.

Defendants filed a separate objection to the summary judgment evidence and moved to exclude plaintiff's use of his own deposition testimony as summary judgment evidence. ECF No. 30. Defendants argued that the evidence is irrelevant and not probative of any material issue before the Court, and should be excluded pursuant to Rule 402 of the Federal Rules of Evidence. Plaintiff did not respond to the motion to exclude.

## IV. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party bears the burden of establishing the lack of a genuine issue of material fact. Id. "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond

peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the movant does not bear the burden of proof at trial, he is entitled to summary judgment if he can point to an absence of evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Similarly, a movant without the burden of proof at trial may be entitled to summary judgment if sufficient evidence "negates" an essential element. *Id.* The lack of proof as to an essential element renders all other facts immaterial. *Id.*

A fact is material if it could affect the outcome of a case. *Anderson*, 477 U.S. at 247. A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* To survive summary judgment, a nonmoving party must present specific facts or evidence that would allow a reasonable factfinder to find in his favor on a material issue. *Anderson*, 477 U.S. at 247. However, merely asserting a factual dispute or conclusory denials of the allegations raised by the moving party is insufficient; the nonmoving party must come forward with competent evidence. *Id.* at 249–250. The nonmoving party may set forth specific facts by submitting affidavits or other evidence that demonstrates the existence of a genuine issue. *Id. See also* Fed. R. Civ. P. 56(c). Competent evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in her favor. *Id.*

## V.    ANALYSIS

Pacheco raises claims for (1) breach of contract, (2) violation of Title IX, (3) negligence, (4) violation of constitutional rights, and (5) a declaratory judgment under 22 U.S.C. § 2201. Defendants have moved for summary judgment as to the entirety of those claims. Defendants have also moved to exclude plaintiff's use of Pacheco's deposition testimony as irrelevant and not probative of the above claims. The Court will assess motions to exclude first.

### a. **Motion to Exclude**

Rule 56 of the Federal Rules of Civil Procedure states that a party may object that material cited to support or dispute a fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Rule 402 states that relevant evidence is generally admissible—with some exceptions—and irrelevant evidence is not admissible. Fed. R. Evid. 402. Evidence is relevant "if it has the tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401. Defendants argue that the following statement is irrelevant and should be excluded:

> "The affection and dirty talk continued while the two entered Plaintiff's dorm room and after they entered Plaintiff's dorm room." Deposition of Alfonso Pacheco 249:15–250–5.

This statement appears to be an interpretation of Pacheco's testimony contained in plaintiff's response, not the testimony itself. The actual testimony is as follows:

> Q: And you were both intoxicated probably beginning at being at the Cadillac Bar, correct?
> A: Correct, yes.
> Q: And then you both went up to the room together, correct?
> A: Correct.
> Q: And who was leading, you or her, up to the room?
> A: Me.
> Q: Okay. And you were holding her hand?
> A: Just kind of walking together.
> Q: Okay. Were you the two of you continuing to engage in the type of affection activities that you described happening in the car?
> A: To a point, yes.
> Q: Okay. That's a yes or no. Were you?
> A: Yes.

Defendants argue that the evidence is irrelevant because the testimony is self-serving and did not come into existence until discovery. That is, defendants argue that St. Mary's had no knowledge of any "dirty talk" between Pacheco and the complainant when it conducted its investigation. Therefore, according to defendants, this evidence is not probative of a material fact

13

because such evidence could not have affected any decision-makers during the investigation. Mot. 2, ECF No. 30 ("Only evidence St. Mary's was aware of prior to completion of the disciplinary process could have influenced St. Mary's motivation.").

The Court notes that plaintiff's did not respond to this motion to exclude. Normally, this Court would take the motion as conceded. However, defendant St. Mary's motion for summary judgment exhibits include Pacheco's deposition, including this excerpt. Def.'s Mot., Exhibit D, ECF No. 20–5. Further, defendants St. Mary's and Osuna and Vargara cite directly to a portion of this excerpt in their motions for summary judgment to show that plaintiff led complainant up the stairs. Def.'s Mot. 3, ECF No. 20; Defs.' Mot 2, ECF No. 21. It appears, then, that defendants object to *how* plaintiff presents the testimony, rather than objecting that the evidence lacks probative value entirely or arguing that the deposition is inadmissible. However, whether the evidence presented actually raises a genuine issue of material fact is a matter for summary judgment. Indeed, Rule 56(c)(1) specifically states that a party asserting a fact that cannot be or is genuinely disputed "must support the assertion by citing to particular parts of materials in the record, including depositions. . . ." Fed. R. Civ. P. 56(c)(1)(A). Surely defendants do not argue that the depositions on which their motions partially rely are inadmissible.

Finally, the Court rejects the argument that only evidence St. Mary's was aware of prior to the investigation is relevant. First, Pacheco's claims concern the integrity of the investigation itself, including whether Pacheco was discriminated against for being male and whether St. Mary's breached a contract with Pacheco by failing to adhere to the procedures outlined in the Student Handbook. Therefore, whether St. Mary's prohibited Pacheco from testifying and what evidence the investigation panel did or did not have before it are certainly facts of consequence in determining whether the investigation complied with the requirements of Title IX or amounts to a

breach of contract. Therefore, such evidence is relevant to the Title IX and contract claims. Second, Pacheco's claims also include excessive force by the police officers investigating the incident as a criminal matter. Certainly Pacheco's testimony as to the officers' treatment of Pacheco is relevant to those claims, whether or not St. Mary's was aware of that testimony or the officers' alleged conduct at the time of the investigation.

In short, Pacheco's deposition testimony passes the low bar of relevancy under Rule 402, particularly in light of defendants' own use of that evidence. For the above reasons, the Court finds that Pacheco's deposition testimony—as a whole and the above excerpt—are relevant and should not be excluded. Defendant's motion to exclude will therefore be denied.

### b. Motions for Summary Judgment

Defendants moved for summary judgment on the entirety of plaintiff's claims. Pacheco's complaint raises claims for (1) breach of contract, (2) violation of Title IX, (3) negligence, (4) violation of constitutional rights, and (5) a declaratory judgment under 22 U.S.C. § 2201. The Court will assess each claim separately.

### i. Breach of Contract

Pacheco's complaint alleges breach of contract against St. Mary's, but no such claims are alleged against Officers Osuna and Vargara. "Under Texas law, a plaintiff alleging a breach of contract must show '(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *Villarreal v .Wells Fargo Bank, N.A.,* 814 F.3d 763, 767 (5th Cir. 2016) (quoting *Wright v. Christian & Smith,* 950 S.W.2d 411, 412 (Tex. App.–Houston [1st Dist.]

1997, no writ). St. Mary's argues no contractual relationship existed, and even if it did that Pacheco has produced no evidence of breach.

### 1. There likely was a contractual relationship between Pacheco and St. Mary's.

According to plaintiff, a contractual relationship existed between St. Mary's and Pacheco, and the University Code of Conduct was either "a part of that contract" or a contract itself. Compl. 11. Thus, Pacheco argues, St. Mary's was "required to act in accordance with its Student Code of Conduct in resolving complaints of violations of the student Code, in the investigation of those complaints, in the process of adjudicating the complaints before hearing boards, and in resolving appeals brought challenging a disciplinary panel's determination." *Id.* Pacheco's complaint alleges that St. Mary's breached this contract by failing to comply with the Code in eight ways: (1) failing to provide fair notice of the parameters of charged offenses; (2) failing to impartially investigate the allegations; (3) failing to provide the names of witnesses against Pacheco, (4) failing to locate and preserve relevant evidence; (5) failing to compel testimony of student witnesses; (6) failing to allow Pacheco to be present during the disciplinary hearing; (7) failing to allow Pacheco to cross-examine witnesses; and (8) failing to allow Pacheco's appeal to be considered in a "meaningful manner." *Id.* As a result of those alleged breaches, plaintiff alleged, Pacheco has suffered damages such as incurring attorney's fees, "deprivation of future educational opportunities," "inhibition of this ability to transfer to other educational institutions," reputational damage, and loss of future earning capacity.

St. Mary's moves for summary judgment on the grounds that St. Mary's did not breach any contract with Pacheco in its disciplinary proceedings. Def.'s Mot. 6. Specifically, St. Mary's argues that the Code of Conduct in the Student Handbook is not a contract. And even assuming *arguendo* that the Code of Conduct was a contract—or part of a contract—with Pacheco, St.

Mary's claims there is no evidence of breach because he was afforded all the rights set out in the Code.

Several cases have addressed whether a university handbook constitutes a contract under Texas law. Those cases center on whether a school intends to be bound by the language in the handbook. *E.g. University of Tex. Health Sci. Ctr. v. Babb*, 646 S.W.2d 502 (Tex. App.—Houston [1st Dist.] 1982, no writ) (finding that a student catalog expressly stating that a student admitted under its terms could continue under the same catalog established a written contract because the university intended to be bound by its terms); *Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (distinguishing *Babb* and finding that no enforceable contract existed based on the express statement that the provisions of the university catalogue were subject to change); *Tobias v. University of Texas at Arlington*, 824 S.W.2d 201, 211 (Tex. App.—Fort Worth 1991), cert. denied, 506 U.S. 1049 (1993) (finding an express disclaimer of a contract negates the inference of any intent to be bound by the university catalog); *Southwell v. Univ. of Incarnate Word*, 97 4 S.W.2d 351, 355–56 (Tex. App.—San Antonio, 1998, pet. denied) (finding a student bulletin did not itself create a contract between a university and a student because there was no intent to be bound when the college reserved the right to alter the bulletin without prior notice). As noted in *Eiland*, "[a] basic requisite of a contract is an intent to be bound, and the catalog's express language negates, as a matter of law, an inference of such intent on the part of the university." 764 S.W.2d at 838; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. c (1981). Thus, when a handbook lacks express language evincing an intent to be bound and instead contains provisions that reserves a right to change or alter the policies contained in a student handbook, there is no contract because there is no intent to be bound.

Here, Article IX of the Code specifically states that it "shall be reviewed every year" and "may be modified, upon request, by the dean of students or vice president for Student Development from time to time during the academic year" and are "effective upon publication of the modification." Exhibit G, ECF No. 20–9. In other words, St. Mary's can unilaterally modify the terms of the Code and those changes would be immediately effective upon publication. The Court therefore finds that St. Mary's had no intent to be bound by the terms of the Code of Conduct. Accordingly, the Code of Conduct did not itself create a contractual relationship between Pacheco and St. Mary's University.

However, as noted in *Eiland* and *Southwell*, while a handbook itself might not create a contract between a student and a university, an implied contractual relationship may yet exist. "[T]he relationship between a private school and its student has by definition primarily a contractual basis." *Southwell*, 974 S.W.2d at 356 (quoting *Eiland*, 764 S.W.2d at 838). "Accordingly, where a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists." *Id.* (citing *Smith v. Renz*, 840 S.W.2d 702, 704 (Tex. App.—Corpus Christi 1992, writ denied)). Indeed, it seems obvious that St. Mary's impliedly agreed to provide educational opportunities and confer the appropriate degree in consideration for Pacheco's successful completion of degree requirements, while paying tuition and abiding by university guidelines. Thus, as asserted in Pacheco's complaint, the university guidelines—and the Code of Conduct—likely exists as part of a contract between Pacheco and St. Mary's.[4]

---

[4] "The specific terms of such a contract must logically be defined by the college or university's policies and requirements." *Southwell*, 974 S.W.2d at 356. In the absence of language, "the student agrees that those terms are subject to change throughout the course of his or her education." *Id.*

## 2. Pacheco raised no evidence of breach.

St. Mary's argues that even if the Code of Conduct is part of an implied contract, the evidence establishes that no breach occurred. For support, St. Mary's points to Pacheco's admission that he was aware of the investigation process, that he had the right to review the charged allegations, the right to have a non-St. Mary's adviser accompany him, the right to hear testimony and review statements before the panel, the right to present witnesses on his own behalf, the right to offer rebuttals to evidence, and the right to be advised of the appeals process. Pacheco Depo. 81:16–84:7, ECF No. 20–5. Pacheco also testified that he did in fact review the charges, and that he had the opportunity to present witnesses but chose not to attend the hearing. *Id.* Thus, St. Mary's argues, Pacheco was afforded all the rights set out in the Code of Conduct.[5]

In his response, Pacheco fails to even address the breach of contract claims. In fact, the only claims Pacheco even addresses are violations of Title IX and the constitutional violations under 42 U.S.C. § 1983. By failing to present these issues in his response, plaintiff has abandoned these issues. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584 n.1 (5th Circ. 2006) ("[Plaintiff's] failure to pursue [a] claim beyond her complaint constituted abandonment."); *see also Vela v. City of Houston*, 271 F.3d 659, 678–79 (5th Circ. 2001) (finding an argument raised weakly in the pleadings but not re-asserted at summary judgment is abandoned). The Court will treat the motion for summary judgment as to breach of contract as conceded, and defendant is entitled to summary judgment on the breach of contract claim.

---

[5] St. Mary's goes on to address each purported violation of the Code of Conduct. However, because Pacheco failed to address even the theory of breach of contract liability, much less the individual purported breaches, this Court takes these arguments as conceded as to the breach of contract claims. Insofar as plaintiff raises counterarguments while arguing the merits of his Title IX claim, the Court will take those arguments up upon consideration of Title IX.

### ii. Negligence

Pacheco's complaint also alleges that St. Mary's owed a duty to Pacheco "to exercise reasonable care, with due regard for the truth, established procedures, fair notice of the scope of any charged offenses, and the important and irreversible consequences of its actions, as well as the Plaintiffs' various liberty and property rights and interests generally." Compl. 13. Pacheco claims St. Mary's breached this duty "by carelessly, improperly, and negligently performing their assigned duties, mischaracterized the truth, and facilitated a process that violated the rights and other protected interests of [Pacheco]." *Id.*

In Texas, a negligence cause of action has three elements: "1) a legal duty; 2) breach of that duty; and 3) damages proximately resulting from the breach." *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998). "The plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant to establish liability in tort." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). However, the existence of duty "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Id.* As noted by defendants, there is a critical difference between the breach of a duty under a tort theory and the breach of a duty under a contract theory.

To determine whether a claim arises under tort or breach of contract, Texas courts must look to the substance of the cause of action rather than the specific language pleaded. *Farah v. Mafringe & Kormanik, P. C.*, 927 S.W.2d 663, 674 (Tex. App—Houston [1st Dist.] 1996, no writ). It is insufficient, therefore, that Pacheco's complaint pleads both breach of contract and negligence. "Tort obligations are those imposed by law when a person breaches a duty which is independent from promises made between the parties to a contract; contractual obligations are those that result from an agreement between parties, which is breached." *Id.* (citing *Sw. Bell Tel. Co. v. DeLanney*,

809 S.W.2d 493, 494 (Tex. 1991). "Where the only duty between parties arises from a contract, a breach of this duty will ordinarily sound only in contract, not in tort." *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 777 (Tex. App.—Corpus Christi 2003, no pet.). For negligence claims, "there must be a violation of a duty imposed by law independent of any contract." *Ortega*, 97 S.W.3d at 777.

St. Mary's moves for summary judgment on the grounds that the duties giving rise to negligence are "identical and indistinguishable" from the breach of contract claims, which were dismissed above. Def.'s Mot. 6. In other words, St. Mary's argues that the substance of Pacheco's claims sounds in contract, rather than tort, because the claim arises from allegations that St. Mary's violated the Code of Conduct in its investigation and adjudication of the incident. Thus, according to St. Mary's, "there is no recognizable common law or negligence claim as a matter of law." *Id.* The negligence claim, therefore, should be dismissed.

This Court agrees that the substance of plaintiff's negligence claims sounds entirely in breach of contract, rather than tort. The duties allegedly breached by St. Mary's arise from the Code of Conduct, and—as noted above—those duties arise from an implied contractual agreement between the parties here. Excepting the Title IX claims, there is no alleged violation of a duty imposed by law; only duty imposed by the Code of Conduct.[6] Thus, Pacheco's claims sound in contract. Further, Pacheco presented no evidence that St. Mary's breached a duty arising under tort law, and this Court may enter summary judgment on that basis alone. Finally, as noted above, Pacheco failed to even address the negligence claims in his response. Thus, for reasons discussed above, this Court also finds that plaintiff has abandoned his negligence claim by failing to address it in his response to defendant's summary judgment motion. The Court will therefore treat the motion

---

[6] The Court addresses the Title XI claims separately.

for summary judgment as to negligence as conceded. For all these reasons, defendant is entitled to summary judgment on the negligence claim.

### iii. Title IX

Pacheco's complaint also alleges violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 et seq. Title IX's relevant provisions state that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[7] That provision is enforceable through an implied private right of action, patterned after the Title VI of the Civil Rights Act of 1964's ban on racial discrimination in the workplace and universities. *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

The Court pauses to note that the body of law on private Title IX actions regarding a university's procedures in investigating, adjudicating, and disciplining students for sexual assault or sexual harassment is still developing.[8] Generally, private challenges to disciplinary proceedings under Title IX manifest themselves as one of four broad theories: (1) plaintiffs claiming an erroneous outcome of a disciplinary proceeding, (2) plaintiffs claiming selective enforcement of university procedures to students of different sexes, (3) plaintiffs claiming deliberate indifference

---

[7] The parties do not dispute that defendant St. Mary's received Federal financial assistance sufficient to trigger the applicability of Title IX here.

[8] Many cases borrow analysis from a Second Circuit case: *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The parties here both cite to the same case. However, as noted by at least one district court, "there is no binding precedent applying the erroneous outcome standard [or the other standards articulated in *Yusuf*] in Title IX cases in the current jurisdiction." *Plummer v. Univ. of Houston*, 2015 WL 12734039 * 14–15 (S.D. Tex. May 28, 2015). However, the Fifth Circuit *has* cited *Yusuf* with some approval. *See Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) (citing *Yusuf*, among other cases, for the proposition that courts have adopted the same legal standards as Title VII to review Title IC claims). Because both the parties here and the Fifth Circuit have borrowed from the analysis in *Yusuf*, this Court will do so as well.

to sexual harassment or sexual assault on campus, and (4) plaintiffs claiming a university's actions based on archaic assumptions about the roles or behavior of men and women. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (recognizing Title IX claims for erroneous outcome and selective enforcement); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999) (recognizing liability for deliberate indifference that cause students to suffer harassment or make them vulnerable to harassment); *Pederson v. La. St. Univ.*, 213 F.3d 858, 880–82 (5th Cir. 2000) (recognizing classifications based on "archaic assumptions" are facially discriminatory and constitute intentional discrimination in violation of Title IX).

However, regardless of the theory asserted, the heart of Title IX claims brought privately by students against universities is often the disparate treatment of male and female students by universities that received Federal financial assistance. St. Mary's argues that Title IX claims are governed by the *McDonnell Douglas* burden-shifting framework adopted in other discrimination cases, and that Pacheco has not presented evidence supporting a *prima facie* case of discrimination under Title IX. However, St. Mary's cites no binding authority for the application of *McDonnell Douglas* to Title IX cases. The Court therefore must first assess the applicability of *McDonnell Douglas* in this case.

### 1. *McDonnell Douglas and Title IX*

To assess disparate treatment in other discrimination cases, courts use a burden-shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.E.d.2d 668 (1973). In that case, the Supreme Court ruled that employment discrimination plaintiffs bringing suit under Title VII of the Civil Rights Act of 1964 and related statutes, must first establish a *prima facie* case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell*

*Douglas*, 411 U.S. at 802–03; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). The burden then shifts back to the plaintiff to establish that the legitimate reasons offered were not the true reasons, but merely pretext for discrimination. *Id.*

In Title VII cases, evidence of discriminatory intent may be direct or circumstantial. "Because direct evidence is rare, a plaintiff ordinarily uses circumstantial evidence to meet the test set out in *McDonnell Douglas*." *Portis v. First Nat. Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). . Most commonly, disparate treatment is raised as circumstantial evidence of discrimination. For example, in typical Title VII employment discrimination cases, a plaintiff establishes a *prima facie* case by showing he or she (1) is member of protected class, (2) was qualified for the position, (3) was subject to adverse employment action, and (4) was treated less favorably than other similarly situated employees, who were not members of the protected class, under nearly identical circumstances. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (citing *McDonnell Douglas*). The underlying inference here is that if persons of different classes are otherwise similarly situated in nearly identical circumstances, the disparate treatment is likely the result of discrimination. Thus, a *prima facie* case entitles plaintiffs to a temporary presumption that defendants impermissibly discriminated on the basis of race, national origin, sex, etc... It then falls to defendants to furnish nondiscriminatory reasons, and then back to plaintiffs to raise evidence of pretext. Critically, "[a]lthough the intermediate evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v.*

24

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 253).

At the outset, the Court notes the lack of guiding caselaw on Title IX claims in this and other circuits. Admittedly, the application of the *McDonnell Douglas* framework has not expressly been adopted by the Fifth Circuit in Title IX cases, and would not be relevant to cases involving direct evidence of discrimination. *See Trans World Airlines, Inc.*, 469 U.S. at 121 ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996) (bypassing the *McDonnell* framework for an ADA claim with direct evidence of discrimination). However, the *McDonnell Douglas* framework has been used by the Fifth Circuit in a variety of cases to assess circumstantial evidence of discrimination by looking to disparate treatment of different classes of people. *See Vaughan v. Woodforest Bank*, 665 F.3d 632, (5th Cir. 2011) (applying *McDonnell* framework to Title VII claims for race-based discrimination in employment); *Long v. Eastfield Coll.*, 88 F.3d 300, 304–05 (5th Cir. 1996) (applying *McDonnell* framework to Title VII claims for gender discrimination, national origin discrimination, and retaliation in employment); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005) (applying *McDonnell* framework to ADEA claims for age-based discrimination); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) (applying *McDonnell* framework to ADA claims for discrimination on the basis of disability); *Brady v. Fort Bend Cty*, 145 F.3d 691, 712 (considering, but not deciding, whether *McDonnell* framework has potential application in § 1983 claims for patronage dismissals and free-speech retaliation in violation of the First Amendment); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1558 (5th Cir. 1996) (applying *McDonnell* framework to a Fair Housing Act claim, noting there was no evidence presented that other applicants were treated

differently than complainant); *Moore v. U.S. Dept. of Agriculture*, 55 F.3d 991, 995 (5th Cir. 1995) (assuming the normal applicability of *McDonnell* framework for Equal Credit Opportunity Act credit discrimination claims, but finding that plaintiffs with direct evidence of discrimination were entitled to "bypass" *McDonnell* and proceed directly to liability); *Gaalla v. Brown*, 460 Fed. Appx. 469, 479–80 (5th Cir. 2012) (reversing a district court for not applying *McDonnell* framework to a § 1983 claim for race-based discrimination in violation of the Equal Protection Clause in the absence of direct evidence of discrimination).

Further, courts look to the body of law developed under Title VI and Title VII to analyze sex discrimination cases under Title IX. *See e.g. Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) ("In reviewing claims of sexual discrimination brought under Title IX, whether by students or employees, courts have generally adopted the same legal standards that are applied to such claims under Title VII."); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("Because the statutes share the same goals and because Title IX mirrors the substantive provisions of Title VI of the Civil Rights Act of 1964, courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII.") (internal citations omitted). Indeed, it appears that courts in other circuits have applied the familiar *McDonnell Douglas* framework to address Title IX claims for disparate treatment based on sex in the absence of direct evidence of sex-based discrimination. *See Doe v. Columbia*, 831 F.3d 46, 55-56 (2d Cir. 2016); *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 641 (6th Cir. 2003) (suggesting that a plaintiff alleging sex-based discrimination in the enforcement of school policies under Title IX "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University"). Accordingly, the Court will utilize the burden-shifting

*McDonnell Douglas* framework to assess the Title IX claims that allege disparate treatment of students based on sex.

### 2. Pacheco's Title IX claims

Pacheco's complaint—as well as the gravamen of his response to summary judgment—alleges that St. Mary's violated Title IX "in the manner in which it resolves allegations of sexual assault by students in general, and in the case of Alfonso Pacheco in particular." Compl. 12. The Court will first assess the allegations of "general" violations, before reaching the specifically alleged violations regarding the Pacheco investigation and disciplinary proceedings.

### a. "General" violations of Title IX

Pacheco alleged that St. Mary's violated Title IX "in the manner in which it resolves allegations of sexual assault by students in general." Compl. 12. Specifically, Pacheco notes that "[i]n virtually if not all cases of campus sexual assault, the accused student is male and the accusing student is female" and that "the manner in which [St. Mary's] approaches the investigation, adjudication, and appeal of allegations of sexual assault, creates an environment in which the accused is so fundamentally denied due process as to be virtually assured of a finding of guilt." *Id.* Thus, according to Pacheco, St. Mary's disciplinary system is biased towards accusers—often females—to the detriment of the accused—often males. While the specifics of Pacheco's argument is somewhat unclear, it resembles a claim of disparate *impact*—in which facially sex-neutral procedures disproportionately affect students based on their sex—rather than a claim of disparate *treatment*—in which actors intentionally treat similarly situated persons differently because of their sex.

As discussed above, neither the Supreme Court, nor the Fifth Circuit, has squarely addressed the full extent to which Title IX overlaps with Title VI or Title VII. That is, there is no binding authority articulating whether Title IX provides a cause of action for disparate impact based on sex discrimination. However, courts have interpreted Title IX by looking to the body of law developed under Title VI. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (recognizing that Congress modeled Title IX after Title VI, with the explicit understanding that it would be interpreted as Title VI was). Further, the Supreme Court has held that Title VI does not provide a right of action for disparate impact claims because the relevant language applied only to enforcing a prohibition against intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Accordingly, most courts have held that Title IX does not authorize disparate impact claims because it imports Title VI's limitation that plaintiffs may only being private suits to redress *intentional* discrimination. *E.g. Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 946 (D.C. Cir. 2004) (distinguishing permissible Title IX claims for intentional discrimination from disparate-impact claims), abrogated on other grounds by *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1101 (D.C. Cir. 2017); *Fort v. Dallas Indep. Sch. Dist.*, 82 F.3d 414, 1996 WL 167072, at *4 (5th Cir. Mar. 11, 1996) (unpublished) (noting a split on whether Title IX claims require discriminatory intent, but holding that a Title IX plaintiff must establish intentional discrimination); *Manley v. Tex. S. Univ.*, 107 F. Supp. 3d 712, 726 (S.D. Tex. 2015) ("There is no basis for a disparate impact claim under Title IX."); *Doe1 v. Baylor Univ.*, ___ F. Supp. 3d ___, 2017 WL 1831996, at n.3 (W.D. Tex. March 7, 2017) (presuming without deciding that intentional discrimination is required for a Title IX claim); *Doe v. Rector and Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 732 (E.D. Va. 2015) (finding *Sandoval* foreclosed disparate impact claims under Title VI and Title IX). Therefore, to the extent that Pacheco brings disparate impact claims,

28